Russell F. HUNT et al., Plaintiffs,

v.

DEMOCRATIC PARTY OF OKLAHOMA, Defendant.

No. 75–C–485–B.

United States District Court, N. D. Oklahoma.

Nov. 6, 1977.

Bill V. Wilkinson, Chapel, Wilkinson, Riggs & Abney, Tulsa, Okl., for plaintiffs.

Gene Stipe, Carl D. Hughes, Sam Allen, Legal Intern, Oklahoma City, Okl., James W. Summerlin, Claremore, Okl., Vestor Songer, Hugo, Okl., for defendant.

## MEMORANDUM AND ORDER

BARROW, Chief Judge.

This matter is presently before the Court for a determination of jurisdiction to hear the declaratory judgment action filed on behalf of the plaintiffs against the Democratic Party of Oklahoma.

A brief chronological summary of prior events in this saga will promote luminosity to the lugubrious situation attendant to the participants presently before the Court.

Plaintiffs filed a Motion for Summary Judgment, which was set for oral argument on June 23, 1977. At that hearing it became apparent to the Court, not for the first time, that meshed within the allegations of the plaintiffs' complaint were the determinative questions to be initially resolved, i. e., the jurisdiction of the Court and whether plaintiffs have stated a cause of action.

The Court, at the hearing on June 23, 1977, adjourned the matter, to delve more deeply into the questions raised. At that time the parties were given time to ascertain if a workable agreement as to reapportionment could be arrived at, without the possibility of intervention by the Federal Court. Thereafter, on September 6, 1977, another hearing was had, and testimony and evidence was adduced. The Court, once again, took the matter under advisement as to the questions of whether the law justified proceeding in this matter. At this hearing, the Court, once again gave the parties an additional 60 days to attempt to solve the problem that evidently was "rendering the party asunder". A meeting of the Democratic Party Central Committee brought forth no agreement. Rather, it

appeared by the "one-sided" vote that the members had no doubt determined in advance to take no affirmative action during the period of time allotted by the Court to arrive at an equitable agreement as to reapportionment.

Now, although the Court could be inclined to follow the Latin maxim of "fiat justitia, ruat caelum" (let justice be done, though the heavens fall), stare decisis commands that the ultimate ruling of the Court be made adversely to the plaintiffs.

Plaintiffs in the instant case are all registered Democratic voters in the State of Oklahoma (some of the plaintiffs are duly elected members of the Oklahoma State Senate and Oklahoma State House of Representatives).

The Democratic Party is a political party in the State of Oklahoma. Political parties are voluntary organizations in Oklahoma. Title 26 O.S. § 1–107 defines a political party as:

"Recognized political parties shall include parties whose candidates' names appeared on the General Election ballot in 1974, and those parties which shall be formed according to law."

Title 26 O.S. § 1–108 provides that a group of persons may form a recognized political party at any time except during the period between July 1 and November 15 of any even-numbered year, by following the procedure set up in the statute. The statutes of Oklahoma further provide that "a Primary Election shall be held on the fourth Tuesday in August of each even-numbered year, at which time each political party recognized by the laws of Oklahoma shall nominate its candidates for the offices to be filled at the next succeeding General Election * * *." Title 26 O.S. § 1–102.

Title 26 O.S. § 1–105 covers the substitute candidates, and provides, in pertinent part:

"In the event of the death of a political party's nominee for office, a substitute candidate will be permitted to have his name placed on the General Election ballot if the following procedure is observed:

"1. If the nominee was a candidate for county office, the political party's central committee of said county shall notify, in writing, the secretary of the county election board of said nominee's death within five (5) days after said death occurs, and shall, within fifteen (15) days after such notification, certify to the secretary the name of a substitute candidate, who shall be selected in a manner to be determined by the county central committee of said party.

"2. If the nominee was a candidate who filed his Declaration of Candidacy with the State Election Board, the political party's state central committee shall notify, in writing, the Secretary of the State Election Board of said nominee's death within five (5) days after said death occurs and shall, within fifteen (15) days after such notification, certify to the Secretary the name of a substitute candidate, who shall be selected in a manner to be determined by the state central committee of said party.

"3. * * *."

Title 26 O.S. § 1–109 sets forth the provisions by which a political party ceases to exist in the State of Oklahoma.

Title 26 O.S. § 2–111 covers nomination of members to the State Election Board by political parties, etc.

The above referenced statutes were effective January 1, 1975, having replaced prior statutes in force. It appears, however, that fundamentally there is little change in the new statutes vis-a-vis the old statutes as here involved.

The Court notes that the plaintiffs have raised no allegations that these statutes are unconstitutional, and, thus, no constitutional challenge as to the statutes is before this Court.

The thrust of the plaintiffs' complaint is that they are being deprived of the right to equal representation (one-man, one-vote) in the Democratic Party in the State of Oklahoma because of the organizational and delegate rules presently in effect in the party. They allege that the organizational structure of the party, as presently constituted, is grossly disproportionate because the rep-

resentation is based on geographic rather than on population areas. Plaintiffs allege that the organizational structure enacted by the Democratic Party dilutes their representation. They further allege in their complaint that such organizational structure discriminates against and deprives "Negroes" in urban areas of the right of equal participation in the party organization. Plaintiffs request that the Court enforce the plaintiffs' legal right to equal representation in the Democratic Party of the State of Oklahoma and order said Democratic Party to promulgate and adopt new organizational and delegate voting rules to provide for equal representation of all Democrats in accordance with the principle of one-person, one-vote.

Plaintiffs allege jurisdiction by virtue of 28 U.S.C. §§ 1343, 1391; 28 U.S.C. §§ 2201–2202; and 42 U.S.C. §§ 1981–1983; as well as alleged violations of the 14th and 15th Amendments to the United States Constitution.

The Declaratory Judgment Act, Title 28 U.S.C. §§ 2201–2202, is procedural in nature. It does not broaden the jurisdiction of federal courts nor bring non-judicial issues within their cognizance. Title 28 U.S.C. § 1391 is the venue statute. Therefore, §§ 2201, 2202 and 1391 do not vest this court with jurisdiction.

The sections to be considered by the Court, thus, are Title 42 U.S.C. §§ 1981–1983; and the 14th and 15th Amendments, in order for the Court to have jurisdiction under Title 28 U.S.C. §§ 1343(3) and (4):

"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

"(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

"(4) To recover damages or secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote."

In its answer, the defendant, among other things, alleges that the complaint fails to state a cause of action and that this Court lacks jurisdiction. Objections that the complaint fails to state a claim upon which relief can be granted may be made by answer or on motion. Moore's Federal Practice, Volume 2A, ¶ 12.05. Therefore, the Court has for initial determination the question of whether the complaint states a claim as well as whether this Court has jurisdiction to entertain the allegations asserted by the plaintiffs.

■ The Court must start with the basic premise that the general proposition espoused by the Supreme Court of the United States is that a political party's management of its internal affairs is protected by its members' First Amendment freedom of association. The Court should not and will not lightly dismiss, as de minimis, a party's choice of organizational structure, even though the Court feels that such organizational structure is implicitly inequitable.

In *Ripon Society v. National Republican Party,* 173 U.S.App.D.C. 331, 369, 525 F.2d 548, 586 (1975), the Court said that the Supreme Court in *Cousins v. Wigoda,* 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975) placed the internal workings of a political party squarely within the protection of the First Amendment. See also *Fahey v. Darigan,* 405 F.Supp. 1386 (U.S.D.C., D.Rhode Island, 1975).

Several recent cases were considered by the Court in arriving, although reluctantly, at its decision in this case.

The first case considered was *Lynch v. Torquato,* 343 F.2d 370 (3rd Cir. 1965) wherein the registered voters of the Democratic county committee of Cambria County, Pennsylvania, brought suit to enjoin them from conducting an election of a county chairman and to require the election of such chairman by the popular vote of all registered Democratic voters. The United States District Court for the Western District of Pennsylvania, 228 F.Supp. 268, entered a judgment dismissing the complaint

and the appeal was lodged. The Third Circuit affirmed, saying at page 371:

"However, the contention of the plaintiff is that the umbrella of the equal protection clause covers an even wider area. For the matter in controversy here is the choice not of county officers, but of a Democratic County Committee and a Democratic County Chairman, the party functionaries empowered to administer the local affairs of the Democratic party.

"The normal and ordinary responsibilities of such local party leaders are familiar. They administer a miscellany of party business. They may be responsible for raising and spending money in the party interest. They may plan and direct local political campaigns as well as continuing efforts to win new party adherents and to encourage voter registration between campaigns. They may administer political patronage.

"*But the citizens's constitutional right to equality as an elector, as declared in the relevant Supreme Court decisions, applies to the choice of those who shall be his elected representatives in the conduct of government, not in the internal management of a political party.* It is true that this right extends to state regulated and party conducted primaries. However, this is because the function of primaries is to select nominees for governmental office even though, not because, they are party enterprises. The people, when engaged in primary and general elections for the selection of their representatives in their government, may rationally be viewed as the 'state' in action, with the consequence that the organization and regulation of these enterprises must be such as accord each elector equal protection of the laws. In contrast, the normal role of party leaders in conducting internal affairs of their party, other than primary or general elections, does not make their party offices governmental offices or the filling of these offices state action which must satisfy the requirements of *Gray v. Sanders.*

"However, this is not the end of the matter. *In addition to the duties of the type already discussed, the party chairman in Cambria County is alleged to be the person who in fact exercises the party's power of choosing a substitute party nominee when a nomination for countywide governmental office becomes vacant as a result of the death or disqualification of a party nominee between primary time and election time. It is arguable that, in making such emergency selection of a substitute nominee, a party leader is exercising a constitutionally protected function of the electorate and, therefore, that he can constitutionally do so only if he himself has been chosen by a process which respects the 'one man one vote' principle. Whether the equalitarian requirement of the Fourteenth Amendment extends to procedural alternatives of primary elections, and particularly to such post-primary emergency nominations as we have here, may well be doubted. But we need not and do not decide these questions.* For even if it should be unconstitutional for party leaders chosen in an undemocratic manner to make emergency designations of party nominees for governmental office, it does not follow that these party leaders are constitutionally disqualified from performing their many and varied normal functions of administering the party business. A party chairman may perform these functions throughout his term of office without ever having occasion to select a substitute nominee for governmental office.

"If the plaintiffs' theory of the application of the equal protection concept to emergency nominations is sound, it might arguably support a proceeding to restrain undemocratically chosen county officers from making such nominations. But that is not this case. Rather, the complaint is a general challenge to the right of a person who has not been selected in accordance with the one man one vote principle to serve as party County Chairman. The nature of the office and its normal responsibilities make this claim much too broad for constitutional validity.

"In our view the only relief to which the plaintiffs might have an arguable constitutional claim would be an order restraining a County Chairman chosen in an undemocratic way from making party nominations for elective public offices. But it is not alleged that the County Chairman has made any such nomination or that the unusual situation has arisen in which he is authorized to do so. Thus, neither a violation of the plaintiffs' rights as voters nor the imminent prospect of such violation appears in this case. *Indeed, this lawsuit appears to be an effort of dissidents to wrest control of ordinary party affairs from the present leadership rather than an attempt to vindicate the plaintiffs' right to share equitably in the choice of nominees for public office in some emergency situation which may never arise. Thus, an anticipatory solution of a possible future controversy of constitutional dimensions is urged upon us as justification for judicial intervention in a present controversy which involves no actual or imminently threatened violation of constitutional rights.* "*In these circumstances, this is very clearly a proper case for judicial abstention from constitutional decision pursuant to the wholesome and authoritatively accepted principle that 'federal judicial power is to be exercised \* \* \* only at the instance of one who is himself immediately harmed, or immediately threatened with harm, by the challenged action'.*" (Emphasis Supplied)

The Court then dismissed the action with the following comment:

"We respect the sound doctrine which disapproves the anticipation of constitutional questions by affirming the dismissal of this action without expressing any opinion upon the validity of the presently authorized method of making emergency nominations for county office in Cambria County."

In 1972 the Second Circuit Court of Appeals had before it the case of *Seergy v. Kings County Republican County Committee,* 459 F.2d 308 (2nd Cir. 1972), a challenge to the New York Election Law. In distinguishing the *Seergy* case, supra, in *Todd v. Oklahoma State Democratic Central Committee, et al.,* 361 F.Supp. 491 (U.S.D.C.W. D.Okla., 1973) it was said:

"The holding in *Seergy v. King's County Republican Committee,* C.A.2, 1972, 459 F.2d 308, is not to the contrary. There, as here, the Complaint alleged that the Plaintiff's constitutional right of one person, one vote had been invalidly diluted. But there, unlike here, the Election Law of the state prescribed the manner in which state and county party committees are to be established and further provided that the county committee should consist of two members elected from each election district within the county and also that the voting power of each member thus elected should be in proportion to such party vote in his election district. The Election Law provided, however, that each county committee might adopt an alternative election procedure whereby additional members, up to four, might be elected from each county election district and that, in the counties adopting this alternative each member of the county committee should have one vote.

"The Defendant King's County Republican County Committee adopted the alternative statutory procedures for the election of its county committeemen. Thus each county committeeman had an equal instead of a weighted vote which he would have had if the subject committee had adopted the first statutory alternative and had limited each county election district to two committeemen. Because of the wide disparities in the Republican voter strength among the election districts in King's County the committeemen from election districts in the county with low Republican enrollment exercised a voting strength much greater than the proportionate strength of the Republican voters they represented. It was this failure to accord voting weight in proportion to the voting strength of each committeeman's constituency that was attacked by the Plaintiffs in *Seergy,* supra, as violative of the one man, one vote principle.

In short, the Plaintiffs therein contended that in all county committee matters they were entitled in effect to the equivalent of one Republican, one vote.

"The Court declined to adopt the argument as respects the Defendant Committee's internal affairs. The Court said that the Equal Protection of the Law Clause does not mandate the adoption by the Committee 'of weighted voting in the performance of their major duty and function as committeemen, which is to conduct the internal management and business of the county committee. Whatever its reason for giving disproportionate weight to the vote of some committeemen in such matters * * * when the county committee acts only as a private voluntary association of citizens, it is no more bound by the constitutional duty to weigh committee members' votes according to the number of constituents represented by them than is any other private club.' It was only as to the extent that Section 12 of the Election Law of the state authorized disproportionate voting by committeemen in their infrequent performance of public electoral functions that the statute was violative of the one man, one vote principle. The Court held only that the 'second alternative allowed by § 12 of the Election Law, as implemented by the Art. 1, § 1, King's County Republican County Committee Rules, is invalid as applied to those rare instances where the committee performs a public electoral function.' p. 315.

"The Court finds no provision in the laws of Oklahoma, either identical or comparable to those of the New York Election Law, * * *. It follows that the case is clearly distinguishable from the case at hand."

The *Todd v. Oklahoma State Democratic Central Committee* case, supra, was a class action by state political electors alleging that their constitutional rights, as electors, of "one person, one vote" had been invalidly diluted and seeking declaratory and injunctive relief against the Party Central Committee, chairman of the party, and against the Governor and the Attorney General.

At page 493, the Court said:

"Political parties are voluntary organizations in Oklahoma. A political party in Oklahoma is defined as 'an affiliation of electors representing any political organization which, at the next general election preceding, polled for President or Governor at least five per centum of the entire vote cast for either of said respective officers, or any such political organization which may have polled at least ten per centum of the vote of as many as three other states at the last election held in such states.' 26 O.S. § 111. The statutes further provide that 'political parties in this state shall select or nominate their respective candidates for the various national, state, district, county and township offices by a primary election or elections * * *.' 26 O.S. § 112a."

The Court is aware that the statutes involved in the *Todd* case were amended in January, 1975, as set forth above.

The Three-Judge Court went on to say that the organization of the Democratic Party of Oklahoma is structured by the constitution of the party and that the " * * * structural organization and rules of the Democratic Party of Oklahoma are mandated by the constitution of the Party and not by state statute". The Court did, however, note that the existence of the State Democratic Central Committee is recognized by statute in the statute dealing with the State Election Board.

One of the statutes specifically attacked in the *Todd* case was the statute dealing with the vacancy of a nominee if such nominee declined to stand for election or died.

In the *Todd* case, the plaintiffs predicated Count One of their complaint as follows:

"Count One alleges that 'all members of the Defendant Central Democratic Committee are elected on a disproportionate population (sic) basis,' in that each precinct, regardless of the number of registered electors, elects a Chairman and Co-chairman who, as members of the County Central Committee, elect the chairman and Co-chairman thereof, and also elect

the Chairman and Co-chairman of the Congressional District Committee, * *."

The Complaint prayed for the Court to declare the process by which the Constitution of the Oklahoma State Democratic Party selects the members of the State Central Committee to be null and void as a violation of the one person, one vote rule of the Fourteenth Amendment. Plaintiffs, in the *Todd* case, predicated Count One on the cases of *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663, and its progeny, *Reynolds v. Sims,* 1974, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506; *Wesberry v. Sanders,* 1964, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481; and *Gray v. Sanders,* 1963, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821. The Court said that it was to be noted that the precinct lines are drawn by the County Election Board, 26 O.S. § 25 and that the party organization had nothing to do with laying out the precinct. The Court then said:

> " * * * *Baker v. Carr, supra, simply held that a case involving 'dilution' of a voter's right of suffrage presented a justifiable question under the Equal Protection Clause of the Fourteenth Amendment. The case affords no protection to one who has no right to vote for the members of the Defendant Committee because there is no right to be diluted.*"
> (Emphasis Supplied)

At page 495, the Court said:

> "*Gray v. Sanders, supra,* is not controlling herein. In denying the applicability of *Gray v. Sanders, supra,* in *Lynch v. Torquato,* 1964, C.A.3, 343 F.2d 370, Circuit Judge Hastie said:
>
> "For present purposes we may assume that the same principle would control a precinct unit scheme of voting to choose party nominees for county-wide executive and legislative office. * * * However, the contention of the plaintiffs is that the umbrella of the equal protection clause covers an even wider area. For the matter in controversy here is the choice not of county officers, but of a Democratic County Committee and a

Democratic County Chairman, the party functionaries empowered to administer the local affairs of the Democratic party. * * * the citizen's constitutional right to equality as an elector, as declared in the relevant Supreme Court decisions, applies to the choice of those who shall be his elected representatives in the conduct of government, not in the internal management of a political party. It is true that this right extends to state regulated and party conducted primaries. However, this is because the function of primaries is to select nominees for governmental office even though, not because, they are party enterprises. The people, when engaged in primary and general elections for the selection of their representative in their government, may rationally be viewed as the 'state' in action, with the consequence that the organization and regulation of these enterprises must be such as accord each elector equal protection of the laws. In contrast, the normal role of party leaders in conducting internal affairs of their party, other than primary or general elections, does not make their party offices governmental offices or the filling of these offices state action which must satisfy the requirements of *Gray v. Sanders, supra.*"

In deciding to abstain, the Three-Judge Court said:

> "Likewise in the case at bar the Complaint neither alleges that the Defendant Committee has made or is threatening to make, any nomination of replacement nor that an unusual situation has arisen in which the Defendant Committee is authorized to do so. In truth, the Complaint is devoid of any allegation that the Defendant Committee throughout its lengthy history has ever made such a nominee replacement. This Court adheres to the sound doctrine which disapproves the anticipation of constitutional questions and finds that the Motion to Dismiss of each Defendant should be sustained."

The *Todd* case, *supra,* is cited with approval in the case of *Fahey v. Darigan,* 405 F.Supp. 1386 (U.S.D.C.D.Rhode Island, 1975).

Based on the foregoing cited cases, the Complaint in the instant litigation, on its face, reflects the following:

■ 1. There has been no showing on the face of the complaint that any minority in the urban area has been treated any differently from a majority in the urban area. The sociological habitat of Homo Sapiens is not dictated by a political party, but by the economic and social habits of a society. The disparity in this case in classification and representation, if any, does not arise from the social impact of minority versus majority—it arises from a lack of sizeable population in rural areas as opposed to the populous urban areas. The allegation made in the complaint by the plaintiffs is more than an alleged discrimination against the minorities—the complaint reveals that the majority, as well as the minority are discriminated against by virtue of the manner in which the present Democratic Party Central Committee is constituted. The apparent disproportionate distribution of the populous of the State of Oklahoma cannot be attributed to any action on the part of the Democratic Party (or any political party). The Complaint, in its present posture, does not state a cause of action under Title 42 U.S.C. §§ 1981–1983.

■ 2. The Fifteenth Amendment prohibits a State from denying or abridging a Negro's right to vote, *Gray v. Sanders,* supra. The Complaint, in its present posture, shows no state involvement and no abridgement of the right to vote for an elective office, and, therefore, does not state a cause of action under the Fifteenth Amendment.

3. The Complaint, on its face, does not show a violation of the Fourteenth Amendment based on the case law hereinabove cited, and, thus, the Complaint does not state a cause of action under the Fourteenth Amendment.

■ 4. The case law hereinabove cited does indicate that there is a possibility of a violation under the Fourteenth Amend-

ment, if and when the Central Committee of the Democratic Party should in fact nominate an individual in the event of the death or inability of a nominee to run in the general election after the primary election (which occurrence has not been alleged in this complaint). Such procedure for nomination by the Central Committee of the Democratic Party, if and when instituted could possibly state a cause of action under the "one-man, one-vote" decisions of the United States Supreme Court. This Court feels, under the cited case law, that such a nomination with the present procedure for composition of the Democratic Central Committee, (geographical rather than population) could result in a questionable disenfranchisement of the Democratic Party members as a whole. There has been, however, no showing of a present danger that the Central Committee of the Democratic Party intends to appoint a substitute nominee at this time. The case law is replete in holding that Federal Courts should not anticipate such action, without a present danger, and, therefore, this Court should abstain, as this Court does at this time. The Complaint on its face, as well as the evidence and argument adduced at two hearings, shows no present danger of a violation of the Fourteenth Amendment of the United States Constitution.

The Court, therefore, finds that this cause of action and Complaint must be dismissed for failure to state a claim and for the lack of jurisdiction. *The Court does not, however, preclude the plaintiffs from refiling any action they deem appropriate by the proper "vehicle" to vest the Court with jurisdiction, when and if the allegations and facts are such as to state a cause of action that would create jurisdiction in this Court.*

The Court, having so found, need not determine the question of the political question doctrine raised by the parties.

5. Of course (as evidenced by the two periods of time granted by the Court to resolve their differences) the Court was

hopeful that the parties would work out a satisfactory solution among themselves. The Court can only comment that it "takes big persons to admit inequities exist, especially when the inequities inure to their benefit—it takes *even* bigger persons to agree to adjust those recognized inequities."

6. Defendant is no doubt aware (to paraphrase an oft used axiom) that the "wheels of justice, although they may grind slowly—nevertheless grind". There is little doubt but that in the foreseeable future there is the possibility that the Democratic Party could be faced with the very situation that concerns the Court—the nomination of a candidate by the Central Committee of the Democratic Party as thus constituted on geographic rather than populous representation. The utter chaos and resultant disorder of such a situation could catapult the Democratic Party into a Court mandated reapportionment at that time to assure the members of the Democratic Party of the "one-man, one-vote" representation that our great country is founded upon. This basic right is not taken lightly by the Court.

Nevertheless, the Court finds, under the controversy presented in this litigation, that the following order must be entered, and, thus,

IT IS, THEREFORE, ORDERED that this cause of action and complaint as presented to the Court in this case, be and the same are hereby dismissed without prejudice for failure to state a cause of action and submit facts sufficient to create jurisdiction in this Court.